Irwin A. **POPOWSKY,** Consumer Advocate, Petitioner,

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 5, 1994.

Decided Feb. 2, 1995.

Zsuzsanna E. Benedek, for petitioner.

Terrance J. Buda, Asst. Counsel, for respondent.

Before SMITH and KELLEY, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

Irwin A. Popowsky (Consumer Advocate) petitions for review of the November 19, 1993 order of the Pennsylvania Public Utility Commission (PUC) adopting the Administrative Law Judge's (ALJ's) September 9, 1993 recommended decision dismissing for lack of subject matter jurisdiction Metropolitan Edison's (Met–Ed's) and Pennsylvania Electric Company's (Penelec's) joint petition for 1) authority to implement a conditioned power service program; and 2) approval of certain modifications and/or supplements to its existing tariffs in order to implement the program.[1] We reverse and remand for further findings of fact consistent with this opinion.

On April 3, 1992, Met–Ed and Penelec filed a joint petition with the PUC requesting authority to implement a conditioned power service program and to make certain modifications to their existing tariffs in connection therewith.

The Conditioned Power Service ('CPS') Program is a comprehensive power conditioning program designed to enhance, or 'condition,' electric power at the customer's premises in order to protect today's sensitive electronic equipment and appliances from the adverse effects of intermittent power disturbances. Such power disturbances include:

1. spikes (increased voltage of very short duration);

2. sags (a momentary decrease in voltage);

3. surges (a momentary increase in voltage outside of normal tolerance);

4. flickers (rapid and repetitive sags and surges in the level of voltage);

5. electrical noise (constant high frequency electrical distortion or random low level static);

6. harmonic distortion (alteration due to the operation of non-linear electrical loads like computer power supplies); and

7. outages.

(Met–Ed/Penelec Statement A, pp. 5–10). Power disturbances can have a wide range of effects including inconvenience due to time lost to repair damaged electronic equipment, equipment malfunction, and the need to replace appliances. (Met–Ed/Penelec Statement A, p. 12). The CPS Program is designed to help remedy these effects. (Appendix "A" of Consumer Advocate's Appendices, Joint Petition for Settlement at 5–6.)

. . . .

The [Consumer Electronics Protection ('CEP') Program, one of the two distinct components to the CPS Program,] designed primarily for residential and small business customers, will offer a two stage level of coordinated surge suppression. First, a meter socket surge suppressor ('MSSS' or 'MSA') will be installed by the Company to divert voltage surges and spikes to the ground at the customer service entrance. (Met–Ed/Penelec Statement A, p. 31). The remaining surge will be easily tolerated by most traditional electric equipment. (Met–Ed/Penelec Statement A, p. 31).

The second level of protection will be a surge suppression device positioned at the customer's electronic equipment. This transient voltage surge suppressor ('TVSS') will divert the electrical disturbances that pass through the first line of defense, as well as the majority of daily disturbances that come from within the customer's premises. (Met–Ed/Penelec Statement A, p. 31). The surge suppressor will also protect electronic equipment

---

1. We note that Commissioner John Hanger dissented from the PUC's decision adopting the ALJ's recommended decision. (Appendix "A" of Consumer Advocate's Appendices.)

from disturbances entering the premises via cable television and telephone systems. (Met–Ed/Penelec Statement A, p. 31). The Companies will not install these devices; rather, they will be delivered for installation by the customer. (Met–Ed/Penelec A, p. 31). Persons with a MSA need not purchase or subscribe to the TVSS unit.... (Appendix "A" of Consumer Advocate's Appendices, Joint Petition for Settlement, at 6.)

. . . .

The [Power Disturbance Protection ('PDP') Program, the second distinct component of the CPS Program,] focuses primarily on commercial and industrial customers. The increasing dependency by such customers on sensitive electronic equipment increases the risk and costs associated with power disturbances. (Met–Ed/Penelec Statement A; Met–Ed/Penelec Exhibit A–4). The extensive use and proximity of electronic equipment in commercial and industrial settings creates an opportunity for power disturbances to result from the operation of other electronic equipment as well as the outside electric power supply. (Met–Ed/Penelec Statement A; Met–Ed/Penelec Exhibit A–4). For some businesses, power disturbances can result in equipment damage, economic loss resulting from the need to replace equipment, and lost employee productivity due to 'down time.'

The PDP Program is designed to address these problems with customized power conditioning services and site-specific applications. (Met–Ed/Penelec Statement A, p. 33). The PDP Program offers four services to address customers' power disturbance problems [diagnostic services, engineering and design services, turnkey implementation services and maintenance and repair services].... (Appendix "A" of Consumer Advocate's Appendices, Joint Petition for Settlement at 12–13.)

On April 23, 1992, the PUC's Office of Trial Staff filed a response to the joint petition,[2] alleging, inter alia, that the program does not constitute a utility "service" under Section 102 of the Public Utility Code[3] and that, therefore, the PUC does not have jurisdiction over the proposed program.

"Service." Used in its broadest and most inclusive sense, includes any and all acts done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities, or contract carriers by motor vehicle, in the performance of their duties under this part to their patrons, employees, other public utilities, and the public, as well as the interchange of facilities between two or more of them....

66 Pa.C.S. § 102.

Also on April 23, 1992, the Consumer Advocate filed a response to the joint petition and notice of intervention, stating that, although the proposed program could be innovative and beneficial to consumers, the potential exists for the possible impairment of competition by non-regulated providers of the same or similar services, cross subsidization to non-program customers, discrimination among customer classes and the termination of basic electric service for the nonpayment of program charges.

In 1993, the ALJ held evidentiary hearings on February 3 and 4, March 24 and 25 and April 15. On June 11, 1993, Met–Ed, Penelec and the Consumer Advocate filed a joint petition for settlement, which the Office of Trial Staff did not oppose but refused to sign. (Appendix "A" of Consumer Advocate's Appendices.)

The joint petition for settlement incorporates specific procedures and safeguards that the utilities agree to follow in running the CPS program. The signatory parties "agree that these procedures and guidelines will alleviate the major concerns regarding the

---

**2.** (R.R. 26–30a.)

**3.** 66 Pa.C.S. §§ 101–3315.

structure and implementation of the CPS Program." (Appendix "A" of the Consumer Advocate's Appendices, Joint Petition for Settlement at 17.) The "Guidelines for Implementation of Met–Ed/Penelec Conditioned Power Service (CPS) Program" are found in Exhibit "D" of the joint petition for settlement. Briefly, the guidelines are as follows:

1. The utilities shall implement the program fairly and reasonably and in a manner not likely to be interpreted as misleading or deceptive to the customers;

2. As soon as practicable, the utilities shall fully disclose to the customers the price and nature of the program's services, the limitations of the program's services, a customer's potential need for the services, warranties, the optional nature of the program, availability of applicable program tariffs, the basis and condition for any termination of program services and the availability of non-regulated options;

3. The utilities shall identify employees to which customer questions regarding the program should be directed;

4. The utilities shall develop educational materials explaining the program;

5. In advertising or promoting the program, the utilities may, when appropriate, inform customers that the program is tariffed by the PUC, but may not suggest that the program is PUC endorsed;

6. The utilities may not provide the program to any customer without a clear affirmative assent;

7. As part of the CPS program's annual report to the PUC, the companies shall provide detailed information to the PUC regarding the program's implementation;

8. The utilities shall draft plain language documents conveying any manufacturer's warranty relevant to the program;

9. *The utilities shall not terminate metered electric service solely for a customer's failure to pay CPS program charges;*

10. *No CEP program services shall be offered to any customer as a requirement* *for the commencement or continuation of metered electric service;*

11. Without an objective factual basis, the utilities shall not make any representations regarding the services of a non-regulated provider of CPS Program-like services or products;

12. During the first three years of implementation, the utilities shall conduct detailed surveys regarding the program; and

13. The utilities shall attempt to resolve customer complaints about electric service pursuant to relevant PUC regulations.

(Exhibit "D" to Joint Petition for Settlement at 1–5) (emphasis added).

In addition, in the joint petition for settlement, the signatory parties requested that the PUC find that "[a]t the present time, it appears that the proposed structure, design and implementation of the CPS program is reasonable and will not involve cross-subsidization, or pricing below cost over the five year implementation period" and that "[t]he investment, revenues and expenses associated with the CPS Program shall be isolated and segregated from the Companies' base rates and shall have no impact on retail rates charged to non-participating customers until after the fifth year of implementation." (Exhibit "D" to Joint Petition for Settlement at 18–19.)

Having declined to sign the joint petition for settlement submitted by the utilities and the Consumer Advocate, the Office of Trial Staff continued to challenge the PUC's jurisdiction over the proposed program and both the companies and the Office of Trial Staff filed main and reply briefs on that issue. The record was closed on July 9, 1993.

▆ The issue before us for review is whether the PUC erred in concluding that it did not have subject matter jurisdiction over the proposed conditioned power service program offered by Met–Ed and Penelec. Our scope of review here is limited to determining whether constitutional rights have been violated, an error of law committed or wheth-

er the findings are supported by substantial evidence. *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 113 Pa.Commonwealth Ct. 68, 536 A.2d 846 (1988).

The Office of Trial Staff does not dispute that Met–Ed and Penelec are public utilities over which the PUC has jurisdiction.[4] The dispute is whether the provision of a conditioned power service program constitutes a service under the Code such that the PUC has power and authority to enforce Code provisions as they may relate to that service. *See* 66 Pa.C.S. § 501(a) (general powers of PUC).

Using basic statutory construction, the Consumer Advocate argues that, considering Section 102 of the Code's broad definition of service, the proposed program easily constitutes "any and all things furnished or supplied ... by public utilities [Met–Ed and Penelec] ... in the performance of their duties under this part to their patrons, employees, other public utilities, and the public." 66 Pa.C.S. § 102. Specifically, the Consumer Advocate contends that the provision of the proposed conditioned power service program comprises their duties as public utilities under the Code and is an effort to improve the quality and delivery of electricity to customers pursuant to the Code.

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

66 Pa.C.S. § 1501.

Notwithstanding the Office of Trial Staff's acknowledgement that the Code's definition of service is broad, it argues that the provision of the conditioned power service program does not constitute a service because as much as eighty percent of power quality problems originate within a customer's own facilities. Thus, because utilities are not required to solve the power quality problems on the customer's side of the meter, the provision of a program that would affect non-utility generated problems clearly does not constitute a service under the Code.

Considering the plain language of the Code, we simply find no requirement that there must be a problem in order for a program to constitute a service and that, if there is a problem, the fact that it could be customer-generated would preclude the provision of some program from constituting a service. For example, a utility's maintenance of vegetation is a regulated service[5] even though fault, either on the part of the utility or the customer, has no relevance to the existence of vegetation maintenance as a service. The fact that a utility could maintain vegetation in an unreasonable manner and thus, cause a utility-generated problem, is irrelevant to the initial determination that vegetation maintenance constitutes a service.[6]

The Office of Trial Staff further argues that the provision of the proposed conditioned power service program does not constitute a service because the companies' determination to initiate the program was motivated by profit and not a desire to increase the adequacy and reasonableness of the provision of their electrical service. Again, the Code simply does not preclude something from being a service merely because it may generate a profit.

The Consumer Advocate next contends that the PUC erred in determining that the

---

4. *"Public utility."*
   (1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:
   (i) Producing, generating, transmitting, distributing or furnishing natural or artificial gas, electricity, or steam for the production of light, heat, or power to or for the public for compensation.
   66 Pa.C.S. § 102.

5. *West Penn Power Co. v. Pennsylvania Public Utility Commission,* 134 Pa.Commonwealth Ct. 53, 578 A.2d 75 (1990), *petition for allowance of appeal denied,* 527 Pa. 660, 593 A.2d 429 (1991).

6. Similarly, call waiting constitutes a regulated service even though there *is* no utility-generated problem necessitating a need for call waiting service. *See Barasch v. Bell Telephone Co. of Pa.,* 73 Pa.PUC 108 (1990).

proposed program did not constitute a service due to the presence of competitors, the optional nature of the program and the fact that the program is not a basic service. It cites numerous instances where the PUC has jurisdiction over services which are also provided by competitors, optional and nonessential.

The Office of Trial Staff, in response, argues that the provision of a conditioned power service program does not constitute a service because it is not directly related to the provision of regulated utility service. As we now discuss, however, some services are regulated even though they are merely adjunct to the provision of a utility service. There are numerous optional and nonessential services which the PUC regulates and which are somewhat analogous to the conditioned power service program at issue. We find several cases to be particularly illustrative.

Although no one disputed that the provision of water constituted a service, in *Honey Brook Water Co. v. Pennsylvania Public Utility Commission,* —— Pa.Commonwealth Ct. ——, 647 A.2d 653 (1994), we acknowledged that a water company's failure to maintain adequate and reasonable water pressure for ordinary household uses and fire protection purposes came under Section 1501 of the Code. Therefore, the water company had to provide that service in an adequate, efficient and reasonable manner.

In *West Penn Power Co. v. Pennsylvania Public Utility Commission,* 134 Pa.Commonwealth Ct. 53, 578 A.2d 75 (1990), we determined that a power company's maintenance of vegetation constituted a service and, therefore, must be executed in an adequate, safe, efficient and reasonable manner. We noted that, under Section 102 of the Code's broad definition of "service," a "utility's 'service' is not confined to the distribution of electrical energy, but includes 'any and all acts' related to that function." *Id.* at 57, 578 A.2d at 77.

In *AT & T Communications of Pennsylvania v. Pennsylvania Public Utility Commis-sion,* 130 Pa.Commonwealth Ct. 595, 568 A.2d 1362 (1990), we acknowledged the Code's broad definition of service and concluded that the PUC properly found that a telephone company's quotation of telephone rates to customers constituted a service. Respectively, we further noted that the Supreme Court and the Superior Court have found the provision of directory listings, assistance in customer deposit practices and the rendering of adequate directory assistance to constitute services under the Code. *Feingold v. Bell of Pennsylvania,* 477 Pa. 1, 383 A.2d 791 (1977); *Morrow v. Bell Telephone Co. of Pa.,* 330 Pa.Superior Ct. 276, 479 A.2d 548 (1984); and *Elkin v. Bell Telephone Co.,* 247 Pa.Superior Ct. 505, 372 A.2d 1203 (1977), *aff'd,* 491 Pa. 123, 420 A.2d 371 (1980).

In addition, the PUC itself has found the provision of various options to constitute services. *See, e.g. Pennsylvania Public Utility Commission v. GTE North, Inc.,* 125 PUR 4th 195, 1991 WL 501874 (1991) (PUC approved settlement agreement regarding a telephone company's use of a packaging strategy to sell optional telephone services to customers); *Robert E. Rebstock v. Philadelphia Electric Co.,* —— Pa.PUC ——, (1990), (No. C–924067, April 27, 1993) (regulated utility's provision of appliance repair service constitutes service under the Code); *Donnelley Directory v. Bell Telephone Co. of Pa.,* 66 Pa.PUC 376 (1988) (operation of yellow pages found to be a service because it is an adjunct to the provision of telephone service); *Philip Maas v. Pennsylvania Electric Co.,* 56 Pa. PUC 34 (1982) (provision of private outdoor lighting service, separate and distinct from basic electric service and unmetered, found to constitute service).

The Consumer Advocate also notes that, when considering an almost identical conditioned power service program proposed by Jersey Central Power and Light, Met–Ed and Penelec's New Jersey subsidiary (R.R. 152a), the New Jersey Board of Regulatory Commissioners determined that it had jurisdiction over the proposed program and stated that "the Board has an obligation ... to

ensure, among other things, that utilities provide safe, adequate and proper service at just and reasonable rates, that there exists no cross subsidization between competitive and monopoly services, and that the rates or services are not unjust, unreasonable, unjustly discriminatory or unduly preferential." *Re Jersey Central Power and Light Co.*, 148 PUR 4th 90, 95, 1993 WL 561957 (1993).

Finally, we find the analysis of dissenting Commissioner John Hanger to be instructive:

> There is no suggestion in the statute that our jurisdiction is limited to those services, activities, or functions which are absolutely necessary in order to provide reasonable service or that optional services are beyond the jurisdiction of the Commission....

> ....

> The Commission has exercised jurisdiction over many optional services in each regulated industry. Moreover, as technology or other circumstances change, the standards for what constitutes reasonable service may change as well. While there appears to be no present basis to conclude that electric service would be unreasonable without 'conditioned power,' it is not unrealistic to anticipate that conditioned power could become a necessity as the sophistication or sensitivity of standard home or commercial appliances increases. Section 1501 explicitly requires extensions and improvements to both service and facilities. There can be no doubt that the proposed conditioned power tariff constitutes a service and facility improvement.

> The ALJ concluded that the Commission has no jurisdiction over the proposed services because there are competitive providers of the same services. While effective competition may obviate the need for regulation, the existence of some competition certainly does not preclude the exercise of jurisdiction by the Commission. Generation of electricity is becoming more and more competitive, for example, but surely the Commission has not thereby lost the legal prerogative to regulate generation by a public utility. This remains true whether or not the Commission has any jurisdiction to regulate a non-public utility provider of the same services. The decision to regulate or deregulate should not normally be made on a piecemeal, case-by-case basis. Instead, such fundamental decisions should be made on a policy or generic basis if possible.

> Moreover, exercise of jurisdiction is in the public interest. Protection against that portion of intermittent power interruptions which occur on the utility side of the meter certainly are an important part of providing basic, reasonable utility service. Additionally, the Settlement Agreement has included important ratepayer protections to ensure that there are no cross-subsidies; that customers will not pay for any operating losses as a result of the service; and that customers will not risk losing basic service for failure to pay for the optional service. The Commission could not enforce such protections without jurisdiction. The Commission's mandate to protect ratepayers does not disappear just because it may not be necessary to protect a public utility from unregulated competitors.

(Commissioner Hanger's Dissent, Appendix "A" of Consumer Advocate's Appendices.) We approve the reasoning of Commissioner Hanger.

For the above reasons, we conclude that the PUC erred in concluding that it did not have jurisdiction over the proposed conditioned power service program and, therefore, reverse its November 19, 1993 order. Further, we remand for determination of 1) whether the June 11, 1993 joint petition for settlement is reasonable and in the public interest; 2) the appropriate rates and tariffs; and 3) whether the proposed settlement provides for protection of the rate structure for the new CPS Program from the existing rate structure for other services, thereby preventing cross-subsidization.

### ORDER

AND NOW, this 2nd day of February, 1995, the order of the Pennsylvania Public

Utility Commission dated November 19, 1993 is hereby reversed and this matter is remanded to the Commission for further proceedings consistent with this opinion.

Jurisdiction relinquished.